# THOMAS J. JOYCE v. METROPOLITAN STREET RAILWAY COMPANY, Appellant.

**Division One, April 13, 1909.**

1. **JUROR: Customer of Defendant: Judicial Discretion.** A sound judicial discretion is lodged in trial courts in the matter of selecting jurors, but there is a limit to judicial discretion. A contracting freight agent of a railroad who solicited business from defendant street railway and all other corporations having freight coming from points along the line of his road, and who testified that he would naturally want to keep in the good graces of defendant, that if he could do defendant any little favor which would not be against his conscience he would do it, that everything he could do that was not unfair or dishonest to get defendant's business he would do, but that his relations with defendant, who is sued in a personal injury case, were the same as those with other customers, and that he was not prejudiced either against plaintiff or defendant, and if selected as a juror he would render a fair and impartial verdict according to the law and evidence, was not incompetent to sit as a juror, and the trial court abused its discretion in excluding him for cause. But if there were no other errors in the case, the judgment would not be reversed for that error alone.

2. **NEGLIGENCE: Evidence: Railings to Platform: Not Constructed as Elsewhere.** The issue of negligence in the construction and maintenance of railings to the platform of an elevated railway can be determined by the jury where the material facts can be placed before them, such as their height and distance from passing cars, and no expert evidence is proper to establish the issue of whether or not their construction and maintenance were negligent; and it is not proper to permit a witness, whether an expert or non-expert, to testify that the railings of platforms of elevated railroads in other cities were not constructed and maintained as the one in question was. The jury are capable of determining, when all the material facts are shown, whether the construction of the particular railing was or was not negligent, and it is not proper to permit them to infer that the construction was negligent because it was not like that at similar platforms in other cities, for the construction of those may have been negligent.

3. ———: Instruction: Passenger: Transfer Ticket. Where a car stopped *to* receive passengers, and plaintiff accepted the invitation thus extended to board, by starting to get on, he was a passenger; and an instruction should not emphasize or mention the fact that he had a transfer ticket and intended to surrender the same, but if it does it is not for that reason prejudicial error.

4. ———: ———: Degree of Care as to Platforms: Confounding Duty to Passenger. The same degree of care is not required of a street railway company in the construction of its platform to an elevated viaduct and the railing thereto as is required of it in the receiving of passengers on its cars and in carrying them; and an instruction which so declares is error. But where its first clause, as to defendant's duty to passengers, is not so confounded with the second clause, as to its duty in the construction of the railing, as to mislead the jury to believe that the same high degree of care is required in both instances, the instruction is not error, especially where defendant could have clarified the instruction by asking one outlining the degree of care required in the construction of the railing.

5. ———: ———: Boarding Moving Car. As a general proposition the jury should not be instructed that if plaintiff attempted to board a car after it had started and while it was in motion, he cannot recover; but where the street railway was an elevated one and between the platform and the tracks there was an iron railing that came up within nine inches of the car and this railing began near the car steps and extended along between the car and the platform in the direction in which the car was going, and there was evidence that plaintiff was three feet from the car when it started and did not then have hold of the handhold, and did not attempt to board the car until after it had started, and was then pulled in between the car and the railing, the instruction should be given.

6. ———: Demurrer. In this case, where plaintiff in attempting to board a car on an elevated street railway, was drawn in between an iron railing along the edge of the platform and the car, and was injured, no demurrer to the evidence should have been given.

Appeal from Jackson Circuit Court.—*Hon. John G. Park,* Judge.

REVERSED AND REMANDED.

*John H. Lucas* and *C. S. Palmer* for appellant.

(1) The court erred in excusing Juror Baum for cause. Glasgow v. Railroad, 191 Mo. 347; State v. Taylor, 134 Mo. 142; State v. Miles, 199 Mo. 544. (2) The court erred in admitting testimony of C. T. Murray as to the method of construction of viaducts in other cities. Hurst v. Railroad, 163 Mo. 309; Lee v. Knapp & Co., 155 Mo. 610; Benjamin v. Railroad, 133 Mo. 274; Gutridge v. Railroad, 94 Mo. 468; Koons v. Railroad, 65 Mo. 592; Helfenstein v. Medart, 136 Mo. 595. (3) The court erred in giving instruction marked "1P." Devoy v. Railroad, 192 Mo. 197; Schepers v. Railroad, 126 Mo. 665; Barth v. Railroad, 142 Mo. 547; Gaffney v. Railroad, 81 Minn. 459. (4) The court erred in giving, of its own motion, instruction 2. (5) The court erred in refusing to give instructions asked by defendant marked "C," "E," and "F." Flaherty v. Railroad, 207 Mo. 318; Peterson v. Railroad, 111 S. W. 37; Schaefer v. Railroad, 128 Mo. 64; Barth v. Railroad, 142 Mo. 535; Spencer v. Railroad, 111 Mo. App. 653; Peck v. Railroad, 178 Mo. 617; Glass v. Galvin, 80 Mo. 297; 1 Blashfield on Instructions, sec. 90. (6) The peremptory instruction on behalf of defendant should have been given. Schepers v. Railroad, 126 Mo. 665; Flaherty v. Railroad, 207 Mo. 318; Peterson v. Railroad, 111 S. W. 37.

*Henry J. Latshaw* and *Ralph S. Latshaw* for respondent.

(1) Appellant's first contention is that the court erred in excusing Juror Baum, and in support thereof cites the case of Glasgow v. Railroad, 191 Mo. 347. Respondent is perfectly willing to stand by the decision rendered in the aforesaid case. The trial court acted within the limits of its sound judicial discretion in excusing said juror, either for cause, or of its own motion. (2) Appellant next complains of the action

of the trial court in allowing Mr. Murray to testify as an expert. This evidence 'was clearly competent, although of very little, if any, value in the case, since it is too clear to require argument that the main or moving cause of plaintiff's injuries was the negligence of defendant in starting the car while plaintiff was getting upon the same. Boettger v. Co., 124 Mo. 104; Combs v. Const. Co., 205 Mo. 391; McGinnis v. Prtg. Co., 122 Mo. App. 236; Kane v. Falk Co., 93 Mo. App. 209; O'Mellia v. Co., 115 Mo. 205; Ahlfeldt v. City of Mexico, 108 S. W. 122; Brunke v. Co., 112 Mo. App. 623; Spencer v. Bruner, 126 Mo. App. 94; Rogers v. Rundell, 106 S. W. 1096; St. Louis Gaslight Co. v. Co., 33 Mo. App. 348; Stanley v. Railroad, 121 Mo. App. 544; Birmingham Furnace & M. Co. v. Goss, 97 Ala. 220; Clark v. Bruce, 12 Hun 274; Cole v. Clark, 3 Wis. 323; Railroad v. Denton, 101 S. W. 452; Atlantic C. L. Co. v. Crosby, 43 So. 318; Estey Organ Co. v. Lehman, 111 N. W. 1097; Zornik v. Co., 113 N. W. 752. (3) Respondent was a passenger at the time he was injured. Berry v. Railroad, 109 S. W. 661; Devoy v. Railroad, 192 Mo. 197; Wood v. Railroad, 181 Mo. 433; Schepers v. Co., 126 Mo. 665; McDonald v. Co., 108 Mo. App. 374; Spencer v. Co., 111 Mo. App. 653; McGuire v. Co., 113 Mo. App. 79; O'Mara v. Co., 102 Mo. App. 202; Archer v. Co., 110 Mo. App. 349; Foland v. Co., 119 Mo. App. 284; Kohr v. Railroad, 117 Mo. App. 302. (4) Appellant next complains that the court should have given at least one of appellant's instructions, C, E or F. There are several reasons why these instructions were properly refused, any one of said reasons being amply sufficient: 1st. Each and all of said instructions omit the important fact, the controlling fact, proven by the witnesses of both appellant and respondent, that plaintiff was upon the car in the first instance and got down therefrom to allow passengers to alight. This fact is not contradicted. 2d. The theory of said instructions is thor-

oughly, fairly and plainly covered by other instructions given. 3d. Instruction "C" says, "if plaintiff attempted to get on said car and fell"—nobody claims he fell—there is absolutely no word of evidence from any witness claiming plaintiff fell, or that anybody thought he fell. 4th. The other instructions, "E" and "F," assume plaintiff was injured "by the motion of the car"—no one claims that to be true—and that by said motion of the car "plaintiff was struck or thrown down"—again, there is no claim for injuries received by being "struck" or by being "thrown down" by the car. The injuries were received, as both parties to this case admit, by plaintiff being caught between the car and the iron pipe fence.

GRAVES, J.—Plaintiff, an alleged passenger, sues the defendant, a street railway corporation, for alleged negligence by which he was injured. Verdict for the plaintiff signed by nine jurors in sum of five thousand dollars and judgment accordingly. The accident occurred July 1, 1904, at Eighth and Main streets in Kansas City, Missouri, at which point the defendant maintained an overhead viaduct some twenty-nine feet above Main street on Eighth street. The negligence charged is thus stated in the petition:

"Plaintiff states that on said July 1, 1904, at about six p. m. thereof, he was in the act of boarding one of defendant's said Independence Avenue cars, east-bound, on said viaduct, for the purpose of being carried on said car as a passenger to the eastern part of Kansas City; that while he was thus attempting to get upon said car, he was injured, through the carelessness and negligence of defendant as hereinafter set forth.

"Plaintiff states that defendant carelessly and negligently built, maintained and used said viaduct in a dangerous and defective condition in this, to-wit: A certain iron railing or fence was allowed to be and

to remain at the eastern end of the platform on said viaduct at or near the place where passengers were in the habit of getting on and off defendant's cars, with defendant's knowledge and consent; that said iron railing or fence was at all of said times by defendant carelessly and negligently allowed to be and remain in a dangerously close position and proximity to the front end of the cars and to the sides of the cars when passing said iron fence or railing, and said iron railing or fence was at all of the said times by defendant carelessly and negligently allowed to be and to remain in such a relative position to said cars that if a person should get between, or be knocked between, or fall between said iron fence and said passing car, there was not room enough for said car to pass without greatly injuring said person, all of which was well known to defendant, or by the exercise of due care and caution could have been known to defendant on July 1, 1904, and for a long time prior thereto.

"Plaintiff states that at the time he was getting on said car, and at the time he was injured as hereinafter stated, he was getting on said car at the usual, ordinary and customary place for people to get on and off defendant's cars on said viaduct, and at the place where defendant invited the public to get on and off its cars, viz: At or near the eastern end of the platform of said viaduct, and about even with the sidewalk line on the east side of Main street.

"Plaintiff states that said carelessness and negligence of defendant furthermore consisted in this, to-wit: That while plaintiff was in the act of stepping upon said car to become a passenger thereon defendant carelessly and negligently started said car up, thereby catching plaintiff between said iron fence and said car, thereby injuring him as hereinafter set forth; although the servants and agents in charge of said car knew, or by the exercise of due care and caution could have known, that plaintiff was then and there in

the act of a stepping upon said car to become a passenger thereon.

"Plaintiff further says that said carelessness and negligence of defendant furthermore consisted in this, to-wit: That while plaintiff was in the act of stepping upon said car to become a passenger thereon, at said time and place, defendant's servants and agents then and there in charge of said car knew, or by the exercise of due care and caution could have known that plaintiff was then and there in the act of getting upon said car as a passenger, and that he had not had reasonable time or opportunity to get safely upon said car.

"Plaintiff further says that said carelessness and negligence of defendant furthermore consisted in this, to-wit: Defendant carelessly and negligently started up said car without first closing the doors of said car, or giving plaintiff any other warning of the intention of defendant's said servants and agents to start said car up.

"Plaintiff says that when defendant's servants and agents started said car up, as above set forth, while plaintiff was in the act of getting thereon as a passenger, plaintiff was thrown between and caught between the said car and the aforesaid iron fence or railing and severely injured as hereinafter set forth.

"Plaintiff further says that after he was thus caught between said car and said iron fence or railing, said car stopped after it had gone a few feet, and thereafter the servants and agents then and there in charge of said car carelessly and negligently started said car up while plaintiff was still pinioned and held fast between said car and said iron fence or railing, thereby increasing the injuries already inflicted as hereinbefore set forth, through the carelessness and negligence of the defendant as above set forth, although said servants and agents then knew, or by the exercise of due care, could have known that plaintiff

then was pinioned and held fast between said car and said fence or railing.''

Answer was a general denial, to which was added a plea of contributory negligence. Reply a general denial. Such are the issues of the pleadings. From this judgment defendant appeals, but not until an adverse ruling upon timely motions for new trial and in arrest of judgment.

One William W. Baum was called and examined as a juror and upon objection made by the plaintiff was excused, to which action defendant objected. This action of the court is pressed as error and hence a statement of the facts as to his qualifications becomes necessary. The rejected juror was a contracting freight agent for the Big Four Railroad. As such he solicited business from street railroads and all other corporations or individuals having freight coming from east of the Mississippi river or going east of that river, and had thousands of customers. His territory covered Missouri, Kansas, Oklahoma, Indian Territory and portions of Iowa. Among the larger patrons of his line was the defendant in this case. The juror said in response to questions by plaintiff's counsel that he would naturally want to keep in the good graces of defendant; that if he could do the defendant any little favor which would not be against his conscience he would do it; that he would like to have all of defendant's business and was trying to get it; that every thing he could do that was not unfair or dishonest and which he could conscientiously do to get the business he would do. The above statements we have drawn largely from the questions of counsel, for the juror usually answered the leading and suggestive questions by a simple, ''Yes, sir.''

Taken by defendant's counsel, he said he had numerous customers in Kansas City; that there were twenty-three railroads and some ten or twelve fast freight lines in business in Kansas City; that his rela-

tions with defendant were the same as with any other customer; that Mr. Burgee was the general western freight agent for his line and he was under him. Then he was asked the following questions which he answered thus:

"Q. State, Mr. Baum, whether if you were selected as a juror in this case, you would render a fair and impartial verdict according to the law, and the evidence, as you should understand it? A. Yes, sir; I would..

"Q. Have you any prejudice against the plaintiff in this case? A. ˉNo, sir.

"Q. Have you any prejudice in favor of the defendant in this case? A. No, sir."

Then after stating that he did not then have and never had had a pass over the Metropolitan line, the following occurred:

"MR. LATSHAW: We challenge the juror for cause.

"THE COURT: You will be excused, Mr. Baum."

To this action of the court defendant excepted, and such is the first question presented by the record.

Leaving this point and going to the *locus* of the accident, the evidence shows that the Metropolitan had a double-track railway on Eighth street; that it had a viaduct beginning at Walnut street on the east and ending at Wall street on the west, and crossing Main street at a height of about twenty feet above the street; over Main street was a sixty-foot platform on this viaduct for the ingress and egress of passengers; to the south and north sides of the viaduct were stairways leading up to these platforms; one platform was to the south of the south track, and the other to the north of the north track; the longest cars were forty-three feet, so that they could so stop as to leave both ends open to these platforms for the entering and exit of passengers. There were a number of photographs introduced in evidence, but they do not appear in the

abstract. These were intended to represent the conditions at the point of the accident. As best we can gather it there was at the end of these platforms an iron railing running first north-and-south from the sides of the viaduct to a point near the railway track, and then others running east-and-west parallel with the rails for some distance. The purpose of these were to keep a passenger in alighting from the car, should his end of the car fail to stop on the platform, from falling down in the street. The distance from this railing from the side of the car at the point where plaintiff was hurt is differently stated by the witnesses, ranging from four and one-half to ten and one-half inches. Plaintiff in attempting to board a car was caught between the moving car and this railing (made of several one and one-half inch gas pipes) running parallel with the track. At to how he got into the place is described by plaintiff and other passengers.

Plaintiff says that he came from the south on a Main street car until he reached the viaduct on Main and Eighth; that he procured a transfer to take an east-bound car on Eighth street to his home; that he went up the east steps on the south side to the platform, and when an east-bound car came he started to board the same; that he got on the steps and was about to step to the platform, when the bell rang to start, and about the same time a man and woman came out to get off; that the man said, "Hold on, let me off." That he looked forward to the motorman and saw that he was not going forward and then stepped back to let the passengers off; that he held to the handrailing with his back to the west; that after the passengers got off he stepped forward to get in the position he first occupied. From this point on he describes the incident in this language: "And as I turned facing north to step onto the car, the car start-

ed and it struck me right here (indicating on arm), and it throwed me back against somebody that had got off the car, or somebody that was behind me to get on the car, I don't know which, but it caused me to turn, and as I turned I was on the railing; the place was open below; I caught the rail with one hand and throwed my body over it; the car passed and caught me right through the thighs; they stopped the car and somebody called for them to go ahead; I was then laying with my head to the west and my feet to the east on the rail; with my limbs underneath the rail; they started the car again, and I called to them to stop, and others, and they did; then, there was a gentleman came running up the steps with what they call a machinist's wrench, and tried to unbolt the bolts at the head of the viaduct for me to get out, and they was rusted, and he couldn't do nothing with them, and he pounded on it; so somebody came with a crow bar and pried it out and lifted me out, and laid me down on the viaduct.''

From this it appears that plaintiff was caught between the car and this iron railing by the onward movement of the car, and that after being caught the car was moved a few feet in an effort to release him, which effort proved futile, and he was pinioned there until a piece of iron piping was obtained with which to release him.

Matthew Hightower, witness for the plaintiff, who was just behind him when the attempt to board the east end of the car was made, described the accident thus:

"Q. Before the accident happened and before you got on the car, you may tell the court and jury just what led up to the accident, how it happened. A. Well, I came up on the viaduct, and the old gentleman that got hurt, me and him both was standing at the front end of the car, and he stepped up in the door of the car in the front end, and I stepped up on the

step and there was a lady and gentleman to get off, and the motorman says, 'Wait until these people get off,' so I stepped off—

"Mr. Loomis (interrupting): We object to that evidence because it is hearsay.

"Objection overruled by the court.

"To which action and ruling of the court the defendant at the time duly excepted.

"A. (Continuing): And the old gentleman just caught hold of the arm of the car and swung himself around, and then I seen there was a big crowd on the car, and I broke for the back end to get on. Just as I stepped up on the steps of the cars, on the inside, they rang the bell to start; directly I heard some one hollering, 'Hold on, somebody's hurt,' and just looked around and I seen it was the old gentleman standing in front of me that it caught, and somebody hollered and told them to stop, and they stopped the car, and then someone hollered, 'Back up,' and they backed the car back, and I hollered myself to stop. By that time they got within about four feet of the end of the banister, and they stopped the car, and then we went and got gas pipe and other prizes, things for to get him out; we could not prize it over far enough to pull him out."

He further said that there was a good big crowd behind him to get on the car; that the conductor was on the rear steps when the bell rang to start; that there was a good big crowd on the car; that the front platform was badly crowded with people when he and plaintiff attempted to get on there, but that they could get on there all right; that when the car started he, the witness, was on the rear vestibule.

Witness M. F. Smith says that he went to the platform to catch a car and when he got there the plaintiff was pinioned between the car and the railing. He then describes the way in which plaintiff was released, which was by the use of the iron piping as a lever, with which "to pry the railing away from the car so the

people outside could lift the man out." This lever was used from the inside of the car through one of the windows.

Charles Bollard who was on the car says that he did not see plaintiff until after he was caught between the car and railing; that the conductor was in the rear vestibule; that the car and both vestibules were crowded; that plaintiff was pinioned in there about 20 minutes.

Witness, Ira Brunner, at the time a passenger on the car, described the incident in this language:

"Q. Now, Mr. Brunner, you may tell these gentlemen here just what you saw there, what happened, tell it in your own way? A. Well, I was on the rear platform on the outside when the—there was a gentleman standing behind me between the controller box and the vestibule; I stood right in front of him. I had my hand on the post, the outside post, and when we reached Eighth street, or Main street, the car stopped for quite a few minutes, and I looked out towards the front end, and I seen Mr. Joyce; he was standing with his left hand on the handhold at the front end; that is, the handhold was on the back part of the front vestibule, and he had his left foot on the step, and there was some ladies or gentlemen got on or off the car, I could not say which; he was standing there, and I turned around and the conductor gave the signal to go ahead, and I looked around and the next I looked out and he was against the side of the car, right at the railing, and just at the time he was caught, and I hollered, 'Stop the car, there is a man caught,' and I ran perhaps two or three feet, and he was in between the railing and the car, and they stopped and somebody hollered, 'Go ahead'; and it was several people hollered 'go ahead,' and the car started and ran perhaps to about the middle of the car and stopped and then I got off and several men got off and we tried to get him out, and there was a carpenter on the car, and he had a hammer, and I took the ham-

mer and I tried to break the head of the screws that held this gas pipe railing, but could not, and somebody ran and got a piece of gas pipe and put it in between the car and the railing and pried it out so they could get him out.''

This witness also says that the car and both vestibules were crowded and that the conductor was in the rear vestibule; that he heard the signal to start and at the time there were some people standing on the platform; that the car stopped quite awhile before it made the first start. In a signed written statement made in response to a letter addressed to the witness by defendant, Mr. Brunner described the accident in this language:

''I was on the rear platform of car which stopped on the viaduct at Eighth and Main, Independence avenue car. I looked toward the front of the car and saw the party waiting for some ladies to get on the car. They got on and the car started and the man tried to get on but was caught between the side of the car and the railing. I called to the conductor to stop the car which stopped but started again; when I called to him again this time it stopped, and the passengers and others got off and released the man from between the car and railing.''

C. T. Murray describes the accident crisply in this language:

''I was on an Independence Avenue car, and the signal for the car to go ahead, and there was a commotion, and somebody hollered a man got hurt, and the car was stopped, and in about half a minute there was another signal to go ahead, and they went ahead about ten feet, I should judge, and they stopped again; I looked out the window and right below me I saw a man wedged in between the iron railing and the side of the car, the iron frame of the car; there was a railing there, I should judge, about an inch and a half gas pipe, and he was caught in between that and the car; I then

tried to get somebody to get a bar to pry him out; finally somebody brought the bar and we pried him out, and the car went ahead. That's about all I know of the case.''

This witness who was, and for years had been, in machinery business, was used as an expert on the manner in which the railing was constructed. His testimony in this regard is urged as error, and this portion of his testimony we will state under that subject in the opinion.

By W. A. Satterlee, assistant general manager of the defendant, the plaintiff got a good many details as to dimensions of cars, their construction, the construction of the viaduct and the platforms thereon, as well as the railings used thereon, and the purpose of such.

By Dr. Eubank, the attending physician, as well as one of the city physicians, the character of the injuries was shown. These were likewise shown by plaintiff and some of the other witnesses.

Such was the plaintiff's case, at the end of which defendant interposed a demurrer to the testimony, which was overruled, the defendant excepting.

The evidence for the defendant tended to show that the plaintiff was injured in attempting to board a moving car.

By Emil Backstrom, the conductor in charge of the car which injured the plaintiff, it was shown that he was at the rear vestibule of the car assisting passengers to alight and enter; that the car was crowded, all seats taken, aisles full and both vestibules crowded; that at the viaduct crossing in question some twelve or fifteen people got off and as many got on, with still others waiting on the platform; that he stopped the car about two minutes; that before he signalled the car to start he looked up the side of the car and seeing no one attempting to get on gave the signals, two bells, to start; that plaintiff had ridden with him before and when he looked forward he saw him standing some

three feet from the car; that the car started upon his signals and had run about half its length when he heard some one holler; that upon looking out as quickly as he could he saw the plaintiff pinioned between the car and the railing. He also says the car did not move backward but moved forward a few inches after the plaintiff was caught.

Hugh Parks, a young man attending the high school, was on the viaduct and as a witness testified: that he was standing on the platform of the viaduct, intending to take the car by which plaintiff was injured; that he ran up to the front vestibule to get on, but the car was so crowded that he did not attempt it; that plaintiff stepped off the car to let someone get off, and stepped two or three feet away, but held to the bar or handhold; that he (witness) turned to look west for another car, and then turned again toward the front vestibule, and about that time the man was trying to get on and was dragged between the car and the railing whilst the car was in motion; that the car was in motion when the plaintiff tried to get on it; that the car and vestibules were loaded full.

C. E. Waldron, a grain merchant, says: that he boarded the car some three blocks to the west of Eighth and Main at Wyandotte street; that he was standing next to the motorman, and facing east; that to his right, was a Mr. Miller, a friend of his; that Miller faced the rear of the car to the west; that the car remained standing rather long, longer than usual; that the bell rang to start and some people started to get off and the car stopped; that these people got off and the bell was sounded and the car again started; that when these people got off and the second bell was given there was a scrambling by people to get back on; that the car and front vestibule was crowded; that the car was not started until all those holding to the car were on it; that after it started Miller cried out that a man had been caught between the car and railing; that he

saw no one attempting to get on as the car started; that the front platform was so crowded that he could not "twist around," that he saw several people get off the car to let those going out get off, but could not say whether plaintiff was one of them.

Charles H. McKee, cashier of Home Telephone Company, testified in behalf of defendant to this effect: that he had been subpoenaed by plaintiff, but not used; that at the time of the accident he was on the step of the car at the front platform or vestibule; that he got on at Eighth and Main; that as he got on the viaduct the car had started and the conductor stopped it, as some people wanted to get off, and he, witness, started to run to catch the car, but when he saw the crowded condition of the car he stopped; that as the car stopped he again started to the front end, when a man and a woman and perhaps a little baby got off; that there was a man standing on the step of the car, who got off to let these parties out; that he (witness) stepped around in front of him and as the car started caught the front handhold and stepped on the car just as it pulled out; that just as he got on the car he looked back and saw this man with one hand on the back handhold take two steps, and witness then get off the step to the platform and saw no more; that at this time the car was in motion, and was in motion when he got on it; that the platform was very much crowded.

O. G. Miller, superintendent of the beef house of the Armour Packing Company, testified: that he was on the platform of front vestibule at time of accident, having boarded the car at Union Depot; when car reached Eighth and Main it was very much crowded; that he was facing west; that there was one man between him and the south edge of the vestibule; that the vestibule was jammed full; that he was talking to Waldron; that after the car started he saw two men make a start for the car; that he was noticing this old gentleman and felt that he was going to get hurt; that

he next heard the old man holler; that he noticed the man in front of him get on, and then he noticed the old man, the plaintiff, start for the car while the car was in motion.

The above is a fair synopsis of the defendant's evidence.

I.   W. W. Baum was a competent juror under the evidence in this case.  [Glasgow v. Railroad, 191 Mo. l. c. 355.]   The juror was frank in his statement of his connection with defendant.  Defendant was his customer, as much as an extensive farmer and stock raiser might be a customer of a merchant.  Merchants as a rule would feel as kindly toward their customers as did this juror toward his customer, the defendant. Merchants would be as anxious to extend to their customers such favors  as in good conscience they could, and nothing more is found in the record as to this juror.  Merchants would try in every way, within reasonable, honorable and proper bounds, to secure all of the trade of their respective customers, and nothing further can be charged to this juror under the evidence. No honorable merchant, if examined as a juror in a case wherein one of his customers was a party, would answer otherwise than did this juror, yet where is the trial court that has sustained a challenge for cause in a case of that kind?  Our reading of the books has not disclosed it.  It remains for a corporation case to furnish a precedent and example.  The sustaining of this challenge for cause was error.  Not only so, but it goes beyond what we conceive to be sound judicial discretion.  We are not unmindful of the fact that a sound judicial discretion is lodged in trial courts in the matter of selecting jurors, but there is likewise a limit to sound judicial discretion.  In this case the limit was reached and passed.  He was challenged for cause and the challenge sustained, simply because, as indicated by the record, he was in the employ of a corporation

of which the defendant, through the efforts of the juror or otherwise, was a customer.

We cannot lend our assent to the proposition that this was the exercise of sound judicial discretion.

II. Part of the testimony of witness, C. T. Murray, is challenged by the defendant. Murray for thirty years had been engaged in the machinery business. He said that he had built several railings for bridges and for stairways, and things of that kind; that he had been pretty much all over the United States, "from Maine to California, from Savannah to Minneapolis," and in practically all of the large cities of the United States; that he had observed the construction of railings and guards along the sides of elevated street car tracks in New York and Chicago; that he had been on four different elevated lines in Chicago and perhaps every line in New York City; that he had been on the elevated line in Kansas City which runs over to Kansas City, Kansas; that he had noticed the approaches to the cars, the railings or whatever was used to prevent passengers from falling off of the structure.

Divers and pointed objections were made by counsel for the defendant whilst the above facts were being brought out. Finally the court outlines certain views, which are best expressed in the language of the record:

"THE COURT: I will let him state what is the uniform distance, if there is any uniform distance, of guardrailings from tracks at points close to arriving and stopping places, but he cannot say what he thinks is right, because he is not qualified."

After an objection again: "THE COURT (interrupting ): Well, I have been all over that exact question, Mr. Loomis."

This was followed by an explanation and suggestion by counsel, and then the record runs:

"THE COURT: I have found that it did in a certain case to my very great sorrow. You must first prove

that there is a uniform distance observed by this witness, before I will let him state what that distance is.

"Mr. Latshaw: Or construction?

"The Court: Yes, sir.

"Mr. Loomis: No, let the inquiry be limited to what the court says.

"The Court: I will not let specific instances go before the jury on direct examination, but I will let these two things go before the jury; if this witness is advised, or if it be a fact that there is a uniform distance for these guardrails to be used from the track rails, or that there is a uniform method of construction. Now, bear that in mind.

"Mr. Loomis: On that I desire to make the specific objection that the witness is not shown to have any knowledge sufficient to justify him in expressing an opinion as an expert on either of those issues.

"Objection overruled by the court. To which action and ruling of the court the defendant at the time duly excepted.

"Q. I will ask you the question in this form, Mr. Murray, whether or not on July 1, 1904, and about that time, there was a uniform construction for guardrails used on elevated structures at a point where cars started and stopped for the discharge and receipt of passengers, used and considered for the purpose of keeping passengers on said platform from falling off of the elevated structure.

"The Court: According to your observation.

"Q. (Continuing): According to your observation.

"Mr. Loomis: The defendant objects to that question because it is not limited to the time nor place of the accident in question, and impliedly calls for the opinion and conclusion of the witness as to what constitutes similar conditions, and calls for his opinion and conclusion upon an issue of fact which is not the proper subject of opinion evidence, and upon which he

has not shown himself competent or qualified to express an opinion.

"Objection overruled by the court. To which action and ruling of the court the defendant at the time duly excepted.

"A. Now, do I understand you want me to express whether—

"(Question read by the reporter).

"A. (Continuing): I want to know if I must express an opinion of exactly like where this happened, or whether it is the general construction of elevated railroads, elevated stations?

"THE COURT: The question is, Mr. Murray, what was the general construction, if there was a plan of general construction, of guardrails and viaducts on which street car traffic passed.

"A. I should say there was.

"MR. LOOMIS: We renew the objection, Your Honor, to that question, make the same objection to that question as to the former question, and the further objection that it calls for his opinion and conclusion of what is general construction, and assumes there was a uniform construction, of which there is no evidence.

"Objection overruled by the court. To which action and ruling of the court the defendant at the time duly excepted.

"THE COURT: I don't want your opinion, Mr. Murray, what we want is your observation.

"A. Yes, sir; there is.

"MR. LOOMIS: We make the same objection.

"Objection overruled by the court. To which action and ruling of the court the defendant at the time duly excepted.

"Q. Now, you may state, Mr. Murray, what that uniform construction was at that time, under those conditions that I have named in the former question.

"MR. LOOMIS: We make the same objection.

"Objection overruled by the court. To which action and ruling of the court the defendant at the time duly excepted.

"A. The construction that I have always seen has been to run the rail out to the edge of the platform, and not run anything beyond that, so that there was no chance to get caught in beyond the platform, beyond the rail.

"MR. LOOMIS: We move to strike out the answer for the same reasons, and for the further reason that the witness is not shown to possess any knowledge as an expert railroad man as to what constitutes proper construction of a railroad structure.

"THE COURT: That part of the answer in which the witness says there is no chance for passengers to fall off, or words to that effect, is stricken out; the rest of the answer may stay in.

"To which action and ruling of the court the defendant at the time duly excepted.

"Q. I will ask you, Mr. Murray, to explain in detail that construction, so the jury will understand it.

"MR. LOOMIS: We object to that for the same reasons, and for the further reason that it is not limited to the construction of other railroad stations at the time or the same locality, in which the accident occurred.

"THE COURT: The objection is overruled; answer, Mr. Murray.

"To which action and ruling of the court the defendant at the time excepted.

"A. I would simply state that this platform and the rail—here is the car track (indicating) and there is nothing on either side of it; that is the rail; there is no projection on this rail, in other words, there is no projection like that (indicating). For instance, if this was the platform, there is no projection like this in between the car and platform; it is simply, that is

the construction right there (indicating). This is the platform, and there is no rail extending clear up to the car.

"THE COURT: The rail extends clear up to the car?

"A. It practically does, as close as it can be got up to the car, and then there is no projection beyond the railing outside of the platform.

"THE COURT: Lengthwise of the track? A. Lengthwise of the track.

"Q. Where does your track go? A. The track goes right along here; this is the track right along there. This is the platform."

Being taken on cross-examination, on the point involved, the witness said that he had never built railroads; that he had never had anything to do with the construction of elevated stations; that he had never had anything to do with the operation of railroads or street railroads over elevated stations; that he was never engaged in the business of building elevated structures or stations for railroads operating on elevated structures; that he was in the machinery business; that he had never drawn plans for such structures.

Now going to the evidence of this witness as finally admitted, as best we can analyze it, the sum and substance is, that he had observed other structures; that in other such structures there was simply a railing, running at right angles with the track, from the outside of the viaduct to a point near the rail, but that there was no railing running from this railing parallel with the track; that there was a general or uniform plan of construction of guardrails and viaducts upon which street car traffic is usually done; this general plan he describes to the jury in the quoted evidence above. Was there error in this? This witness does not testify as an expert in the broad sense of the term, although both plaintiff and defendant treat his testimony as such in the briefs. Nor was he permitted to express but one opinion, and that was as to there being

a generally used plan for the construction of railings upon elevated structures used by street railways. This plan he was permitted to and did describe to the jury. This knowledge, if knowledge it can be called, was such as the witness had obtained by observation. The sum of the charge in the petition on this point was that the railing in question was negligently placed in the beginning too close to the railway track, and later negligently maintained too close to the track. What then was the purpose of this evidence? Evidently to show that there was a general plan for the construction of guardrails at elevated stations and to leave the jury to infer that inasmuch as the one in question was not so constructed it was negligently constructed. Was such testimony, introduced and admitted for this evident purpose, competent? To answer this question we must bear in mind just what was the object of the testimony. The object was to show that this railing running parallel with the track was negligently placed too close to the track and too close to the side of a car standing thereon. There is nothing difficult of description here. The platform could be and was accurately described; the railing could be and was accurately described; the distance between the railing and the side of a car standing on the track was given to the jury. There isn't a thing which was not easily susceptible of accurate description, and in this case all things were accurately described, and measurements and distances shown. Under such circumstances the jury should be left to draw the conclusion of negligence or no negligence from the facts of the case, without being directed to details of the construction of railings in New York, Chicago or elsewhere. Because railings were negligently or not negligently put up elsewhere, does not show that this one was negligently placed too close to the side of a moving car. We doubt the competency of this witness to express an opinion as to whether or not there was a general plan followed in the construc-

tion of railings at elevated stations, but conceding his competency, and conceding the general plan, it does not follow that such is competent evidence to show a negligent structure here. A structure entirely different from a general plan may be entirely safe. Indeed, a structure different from that in general use may be even safer and better than the one in general use. The question is, was the structure under consideration negligently constructed and negligently permitted to remain? The only defect charged is that it was placed too close to the track and thereby too close to a moving car, or broadening a little, that the railing should not have been there at all. With every fact of easy description, this was a question solely for the jury upon the peculiar facts concerning this structure.

Under the head of Evidence of Negligence, in 17 Cyc. 56, it is said: "The issue of negligence can in most cases well be determined by the judgment of a jury and the inference, conclusion, or judgment of witnesses is rejected. This rule has been applied, for example, to the question whether a bridge, road, roadway, sidewalk, or track, or other place, machinery, mechanical appliance, rate of speed, situation or other thing or collection or combination of things is safe or dangerous. The rule has also been applied to the question whether certain conduct of a person was careful or careless. And it has been applied to other questions as to conduct; as whether it was cautious, dangerous, 'in the line of duty,' necessary, negligent, proper, prudent, reasonable, professionably skilful, safe, usual or unusual; and whether such conduct constituted good management, or omitted anything. The exclusion is subject to the proviso that the material facts can be placed before the jury."

And to the same effect is section 7747 of Thompson on Negligence: "It may be stated as a general rule that, if the facts of any particular inquiry can be so placed before the jury that, as men of ordinary intelli-

gence, they can fully understand the matter and draw the proper inferences and conclusions therefrom, the opinions and conclusions of a witness, whether an expert or non-expert, should not be received. In conformity with this rule a witness will not be allowed to state his opinion as to whether an act was *carefully or negligently* done; nor whether the injured party was acting within the line of his duty at the time of receiving an injury; nor as to the safety of a particular appliance or place of work, *where the same can be described and easily understood*; nor as to whether a highway was safe, or defective, or dangerous, at the place where an accident happened; nor what cause or occasion the witness saw for the accident; nor as to matters relating to the sufficiency of a highway, as this is, in general, a question of fact merely, and not of science or skill. In like manner where the question was as to whether the plaintiff had been guilty of contributory negligence, it was held improper to permit the plaintiff to testify as to what he thought about the danger of doing what he did.''

This evidence of Murray's upon this question was extraneous matter and its admission should have been refused. With conditions of easy description and reproduction before the jury, and where the material facts can be placed before the jury, no room is left for expert or other opinion evidence. Every material fact in this case could easily be placed before the jury, and was placed before the jury. Under the facts of this case there was no place for even opinion testimony of the highest character, much less of the character here introduced. Judge Thompson, in a long note to section 7747, supra, has collected all the cases and further notice of them need not here be taken.

But going a step further. This evidence could have been introduced but for the one purpose, *i. e.,* that

the jury might infer negligence, because this platform did not have its railings adjusted as other railway companies had adjusted their railings upon elevated platforms.

In the case of Dougherty v. Railroad, 128 Mo. 1. c. 37, the court had under consideration the following part of an instruction:

"And the jury are further instructed that if the defendant provided and used such platform steps to enable the passengers to alight as 'were ordinarily provided for similar cars on similar roads, then in that respect it has satisfied the requirements of the law."

Judge ROBINSON, in discussing the matter, said:

"The faulty portion of the instruction cannot be justified upon any theory of law; it practically declares that if the platform steps used by defendant at the place and time in question were such as 'were ordinarily provided for similar cars on similar roads,' without regard to the question as to whether the appliance was reasonably safe, dangerous or otherwise, then plaintiff cannot recover. The action of the lower court in promptly repudiating its error is highly commendable. It is not necessary to set out the evidence or consider the other points made. This error alone justified the court's action. The issue was not what platform steps are ordinarily provided for similar cars on similar roads, but whether the platform steps of this particular road at the time when plaintiff was injured were in safe condition. The defendant cannot excuse itself from the obligation to furnish its passengers with reasonably safe appliances for getting in or out of its cars by showing that the appliances it had adopted had been adopted and used by other railroads engaged in a similar work. No amount of elaboration would make the point any plainer or the error in giving the instruction any less."

And so in the case at bar, the question is whether or not there was negligence in having the railing

in question where it was, and not how other companies placed their railings. These other companies might have been negligent, a collateral matter wholly foreign to the case on trial.

So, too, Judge GANTT, in a case discussing the location of a railing at an elevated station, Barth v. Railroad, 142 Mo. l. c. 55, said: "What is a reasonable distance is a question of fact for the jury under the evidence in this case. It was not essential to the plaintiff's recovery that she should prove what space ordinarily is left between the cars and railing by other similar companies. Elevated railroads are comparatively new in this country, and plaintiff might be at a loss to establish a custom, but if defendant had shown, which it did not, that this was the usual distance allowed by other roads of like character, this would not have prevented the jury finding that it was negligence in this case. The mere fact that other roads had been equally negligent would not be a defense to the action. [Dougherty v. Railroad, 128 Mo. 33, and cases cited.]"

Then we say that if proof that a railing is placed as other railroads have usually placed the same, does not relieve the defendant of the charge of negligence, as is held *supra,* and rightly held, then, placing the shoe upon the other foot, proof that other railways have usually placed their railings differently does not convict the defendant of negligence. It is well said by Judge GANTT: "What is a reasonable distance is a question of fact for the jury *under the evidence in this case.*" The italicizing of the words quoted is our act. It is peculiarly the province of the jury to pronounce negligence or no negligence under the facts of this case, when all facts can be clearly presented to the jury. We conclude that there was error in admitting this evidence.

III. Defendant makes divers thrusts at plaintiff's instruction numbered 1. Among other things it

charges that undue prominence is given in the instruction to the fact that plaintiff had a transfer ticket. The instruction is one which states certain facts and concludes with the statement that if the jury found those facts it would find that the plaintiff was a passenger under the law. One of the facts to be found and somewhat emphasized in the instruction, is that the plaintiff had a transfer ticket and intended to surrender the same in payment of his fare. The instruction is much longer than necessary. Nor was it necessary to have said anything about the transfer ticket, although the evidence showed he had one. When the car stopped to receive passengers, as it did, and when the plaintiff accepted the invitation thus extended by the company in stopping the car, by starting to board the same, as he said he did, then he was as fully a passenger as he would have been had he possessed a thousand tickets. Cash in his pocket was the same as a transfer ticket, yet we would not instruct that a jury should find that he had cash in his pocket. Nor was there any good reason for mentioning the matter of a transfer ticket. But we hardly think there was error in the instruction as given—at least not prejudicial error.

Instruction No. 2 for plaintiff given by the court of its own motion is criticized, but we think unjustly so. It would serve no good purpose to reproduce the entire instruction, which at length covers the negligence charged in the petition. The only part to which any objection is at all tenable is found in the first two paragraphs. This might be misleading as to the degree of care required of defendant in the construction of its platform. The quantum of care for receiving and carrying a passenger is properly outlined, but following that is the question of the negligent construction of the railing on the platform. A jury might get the idea that the same degree of care was required of defendant in the construction of its platform and railing, as in receiving on the car and the carrying of the

passenger.  As to this the law does not so read.  The platform doctrine is fully discussed in 4 Elliott on Railroads, sec. 1590, which reads:

"A railroad company is under duty to exercise ordinary and reasonable care to so construct and maintain station buildings, or depots and appurtenances, that they shall be safe for use by passengers.  The duty respecting the construction and maintenance of station buildings is not so rigorous as that imposed upon railroad carriers in relation to roadbeds, tracks, cars, appliances, and the like.  Some of the cases seem to lose sight of the difference between the, duty respecting station buildings and that respecting means and modes of conveyances, but the well-reasoned cases recognize the distinction and affirm that a railroad company that exercises ordinary care in constructing and maintaining station buildings in appurtenances in a reasonably safe condition for use is not guilty of negligence. There is really no valid reason why a railroad company should be held to a higher degree of care in maintaining its station buildings than that to which an individual owner of buildings used for ordinary business purposes is held. The reasoning of the cases which laid the foundation for the strict American doctrine as to the degree of care required of carriers using steam as a motive power cannot, it is obvious, have any application to buildings and structures prepared for the use of travellers.  Modes and means of conveyances employed by railroad companies do require 'powerful and dangerous agencies' but buildings and structures in themselves neither require the employment of 'dangerous and powerful agencies' nor possess unusual elements of danger.  The duty to exercise ordinary care to maintain station buildings and appurtenances in a reasonably safe condition extends to platforms, approaches, urinals and the like.''

Nor is the railing here involved an appliance but on the other hand is a part and parcel of the platform.

Yet we think the first clause of the instruction is not so likely to be confounded with the second clause as to make it misleading, and defendant could have obviated all trouble by asking an instruction outlining the rule of law as to the degree of care required in the construction of platforms.

IV. It is next urged that there was error in refusing instructions C, E and F, offered by defendant. Of these instructions, C, as worded, was properly refused. Instruction F contained, although in shorter form, the idea expressed in instruction E. Instruction E reads:

"The court instructs the jury that the plaintiff had no right to get upon or attempt to go upon the car in question after it had started and while it was in motion, and if he did so he thereby assumed all risk of danger caused thereby, and if you believe and find from the evidence that after the car had started, and while it was in motion plaintiff attempted to get upon the car, and was struck or thrown down and injured by the motion of the car, then you are instructed that his injuries, if any, were caused by his own fault and negligence, and you must find your verdict for the defendant."

There is evidence in behalf of defendant to the effect that when this car started the defendant was some three feet from it and did not have hold of it; and that he attempted to board it after it was in motion. The evidence of the conductor and some others tended to show this fact. This instruction was based upon that evidence, and was one of defendant's theories of defense. This theory was not squarely presented in any instruction given, and was a theory under the evidence which should have been presented to the jury. The court erred in refusing the instruction. Whilst in all cases and as a general proposition this instruction might not be good, and probably would

not be good, but under the facts of this case, with the railing in plain view, it is good.

V. Defendant also contends that its demurrer to the evidence should have been sustained. To this we cannot assent. We have set out the evidence quite fully, because of this contention. We are of opinion that there is sufficient evidence to carry this case to the jury for the plaintiff. This contention will be overruled.

VI. That Baum was a competent juror and that the court transgressed the bonds of judicial discretion in sustaining a challenge for cause, we have no question. That such action tended to give the plaintiff the benefit of four peremptory challenges, when in law he is only entitled to three, must be conceded, but whether defendant suffered injury thereby is another question. If this matter stood alone under our cases we would not say the judgment should be reversed, but when taken with other errors hereinabove pointed out, we think the cause should be reversed and remanded to be retried in accordance with the views herein expressed, and it is so ordered.

*Lamm, P. J.,* and *Valliant, J.,* concur *in toto; Woodson, J.,* concurs in result and in all the opinion except what is said as to the competency of the juror.